Filed 7/11/13  In re J.F. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.F., et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E057127 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ113748) |
| v. | OPINION |
| J.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Anna M. Deckert, Deputy County Counsel, for Plaintiff and Respondent.

J.B. appeals an order terminating her parental rights to her son, J.F., and freeing the child for adoption. She contends that the juvenile court abused its discretion when it failed to find the "sibling relationship" exception to the statutory preference for adoption applicable to J.F.

We will affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY[1]

On June 8, 2010, the Riverside County Department of Public Social Services, Child Protective Services (CPS) filed a second amended juvenile dependency petition alleging that J.B. (mother) had failed to protect her four sons, D.P., J.F., I.G. and N.D. The children were seven, six, four, and two at the time. The petition alleged that mother had an extensive history of abuse of methamphetamine; that she was currently pregnant and had tested positive for amphetamine and methamphetamine; that she had an extensive history with CPS, with prior substantiated allegations of general neglect and substance abuse; and that she had failed to benefit from prior services. As to the alleged fathers of D.P., J.F. and I.G., the petition alleged failure to support. As to the father of N.D., the petition alleged that he had been provided services in the past and had failed to benefit, in that he continued to neglect his child, and that he had an extensive criminal history.

---

[1] The issue raised in this appeal pertains solely to the order freeing J.F. for adoption. We will discuss the entire family's history to the extent that it is relevant to the issue mother raises.

2

The three older children had been made dependents of the juvenile court in 2007, while N.D. had been a dependent from his birth in January 2008 to October 2008. Family reunification services were offered to mother and to N.D.'s father, and the dependency as to N.D. was terminated on October 8, 2008, with joint legal custody for the parents and sole physical custody for mother. Mother was ultimately able to complete her case plan as to the older children, and that dependency was terminated on December 31, 2009.

The current proceeding commenced when mother, who was approximately five months pregnant, came to a hospital with abdominal pain and spotting. She tested positive for methamphetamine and amphetamine. I.G. was with her, and she claimed he was her only child. She claimed that his father had custody, and that I.G. was visiting her. CPS later determined that mother had been living with her mother, with all four of her children.

N.D. was placed with his father, and his dependency was later terminated with his father being granted sole legal and physical custody. A dependency petition was filed after the birth of mother's fifth child, R.B. Reunification services were terminated in that case at the sixth-month review hearing.

The three older boys were placed together in foster care. All three had behavioral and emotional problems, including aggressiveness toward their siblings and other children. J.F. "appear[ed] to have difficulty understanding that violence is inappropriate." As a result of the children's behavior, their original caregivers asked that they be removed from the home. They were placed together in a new home. There, they

continued to have behavioral problems, such as being physically aggressive with each other and with the caregivers and being defiant. Nevertheless, CPS believed that they were adjusting well to the new caregivers.

An aunt who was being assessed as a possible placement reported that she was no longer interested, and the children's grandmother was not suitable in that she had an adult living in the home with an extensive criminal history, which could not be exempted. There were no other relatives known to CPS who were interested in being assessed for placement.

In March 2011, D.P. was moved to a new placement separate from his brothers. J.F. and I.G. were also moved to a new placement. The previous caregiver requested the change in placement because of the children's behavioral problems and because she had difficulty in dealing with mother. The children continued to have contact with one another. They continued to be aggressive, although they were once again described as adjusting well to their new caregivers. At the end of March, I.G. was removed from that placement and placed separately from J.F. because of I.G.'s "escalating emotional and behavioral problems." However, he was placed next door to J.F. and the boys continued to see each other daily.

In a status review report dated July 8, 2011, CPS reported that D.P. and J.F continued to be aggressive and were receiving therapy. J.F. was reportedly doing better. I.G. continued to "throw tantrums and become[] violent when he does not get his way." He was also extremely oppositional and defiant at times and showed symptoms of attention deficit/hyperactivity disorder (ADHD). His therapist had recommended that

I.G. be evaluated to determine if he needed and could benefit from psychotropic medications. I.G. was moved again on August 9, 2011.

On August 24, 2011, mother's reunification services were terminated with respect to D.P., J.F. and I.G. The court determined that it was not appropriate to place D.P. with his siblings.

A nonrelative extended family member expressed an interest in adopting D.P. and J.F., and stated that he might consider adopting I.G. in the future if his emotional and behavioral problems stabilized. CPS recommended continuing the Welfare and Institutions Code section 366.26[2] hearing for 120 days to permit assessment of the prospective adoptive parent and to permit further assessment of I.G. to determine if he was adoptable at that time.[3]

D.P. and J.F. were placed together in the prospective adoptive home on March 9, 2012. CPS reported that despite some initial sibling rivalry and behavioral problems, both boys adjusted extremely well to the placement. Both stated that they would like to stay there and appeared very secure. The prospective adoptive parents were willing and able to provide for their special needs.

I.G. was placed in a group home. He had been placed for a short time in the same foster home as D.P., but his severe emotional and behavioral problems persisted. He was

---

[2] All further statutory references shall be to the Welfare and Institutions Code, unless otherwise indicated.

[3] This report refers to a prospective adoptive "parent." Later reports show that the prospective adoptive family consists of two parents.

diagnosed with ADHD and oppositional defiant disorder. He was committed to Loma Linda Behavioral Medical Center because of assaultive behavior and/or uncontrollable and oppositional defiant behaviors, which posed a danger to I.G. or to others. He was placed on medication, but it failed to control his outbursts and negative behavior or stabilize his emotional functioning. Because I.G. had had eight failed placements and had pervasive emotional and behavioral problems, CPS determined that I.G. had to be placed in a group home where he could receive more intensive mental health services. He was committed a second time to Loma Linda Behavioral Medical Center on April 9, 2012, and upon his release on April 13, 2012, he was placed in an appropriate group home.

The preliminary adoption assessment reported that the prospective adoptive parents and their home were appropriate for D.P. and J.F. The prospective adoptive parents stated that most of D.P.'s aggressive behaviors had declined since being placed in their home, and that his tantrums were manageable. J.F. continued to have some anger management issues and aggressive behaviors, but the prospective adoptive parents reported that his tantrums were declining as he became more adjusted to their home. They planned to enroll both boys in counseling.

D.P. told the adoption worker that he liked living with the prospective adoptive parents and wanted to stay there for the rest of his life. J.F. had some conflicting feelings and said he would like to live with mother, but if that was not possible, he wanted to stay with the prospective adoptive parents. He and D.P. both appeared bonded to the prospective adoptive parents.

6

At the selection and implementation hearing on July 7, 2012, the juvenile court continued the hearing for 60 days for D.P. in order to conduct DNA testing to determine whether an alleged father was his biological father and to address other unspecified issues.  However, the court found that adoption was the appropriate permanent plan for D.P. and J.F.  The court found that I.G. was not adoptable at that time, and found that a planned permanent living arrangement was the appropriate plan for I.G.  The court terminated parental rights and freed J.F. for adoption.

Mother filed a timely notice of appeal challenging only the order terminating parental rights with respect to J.F.

LEGAL ANALYSIS

MOTHER DID NOT MEET HER BURDEN WITH RESPECT TO THE SIBLING RELATIONSHIP EXCEPTION TO THE STATUTORY PREFERENCE FOR ADOPTION

"Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶]  . . .  [¶]  (v) There would be substantial interference with a child's sibling relationship . . . .'  (§ 366.26, subd. (c)(1)(B).)"  (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).)  Under these provisions, "the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a *compelling* reason for finding that termination of parental rights would be detrimental to the child.  The specified statutory circumstances

7

. . . 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R*. (2003) 31 Cal.4th 45, 53, italics added (*Celine R*.).) "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*Ibid*.)

The parent has the burden of establishing by a preponderance of the evidence that a statutory exception to adoption applies. (*Bailey J*., *supra*, 189 Cal.App.4th at p. 1314.) To establish that the sibling relationship exception applies, the parent must show that "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

Mother contends that the sibling relationship exception applies in this case because J.F. had lived with D.P. and I.G. almost all his life, and they "shared the significant emotional experience of disruption, dislocation, and family instability." She contends that this relationship is disrupted by freeing J.F. for adoption while leaving D.P. as a part of the family with mother and I.G. She contends that J.F. will no longer have visits with I.G. while D.P. continues to visit with I.G., because J.F. is no longer part of

8

that family.  She contends that termination of parental rights created a substantial

interference with J.F.'s relationship with I.G., resulting in detriment to J.F.[4]

A juvenile court's finding that the sibling relationship exception does not apply is

reviewed under a hybrid substantial evidence/abuse of discretion standard.  The factual

finding, i.e., whether a bonded sibling relationship exists, is reviewed for substantial

evidence, while the court's determination that the relationship does not constitute a

"compelling reason" (*Celine R.*, *supra*, 31 Cal.4th at p. 53) for determining that

termination of parental rights would be detrimental is reviewed for abuse of discretion.

(*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)

Since the proponent of the exception bears the burden of producing evidence of

the existence of a beneficial parental or sibling relationship, a challenge to a juvenile

court's finding that there is no beneficial relationship amounts to a contention that the

"undisputed facts lead to only one conclusion."  (*In re I.W.* (2009) 180 Cal.App.4th 1517,

1529.)  Unless the undisputed facts established the existence of a beneficial parental or

sibling relationship, a substantial evidence challenge to this component of the juvenile

court's determination cannot succeed.  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Here, mother has utterly failed to show that the evidence compels the conclusion

that termination of parental rights for J.F. disrupted his relationship with I.G. to J.F.'s

---

[4] Mother does not contend that termination of parental rights for J.F. will create a substantial interference with his relationship with D.P.  The only concern she expresses with respect to D.P. is that if the DNA test establishes a biological connection with the alleged father, "another monkey wrench will be tossed into the emotional turmoil."  She does not explain how establishing biological paternity at this late stage of D.P.'s dependency is likely to derail the prospective adoptive parents' plan to adopt D.P.

9

detriment. First, the record refutes the contention that it was the termination of parental rights that disrupted J.F.'s relationship with I.G. or that J.F.'s relationship with I.G. would have been closer or better maintained if J.F. remained a court dependent. I.G.'s mental and emotional state had deteriorated before the section 366.26 hearing, to the point that he required hospitalization twice and placement in a group home with the resources to address his severe emotional problems. Thus, even if J.F. had remained a court dependent, he would necessarily have been placed separately from I.G. Accordingly, it was I.G.'s emotional problems that had disrupted his relationship with his siblings, not the termination of parental rights. Second, mother has not shown that termination of parental rights will disrupt J.F.'s relationship with I.G. in the long term. J.F.'s prospective adoptive parents were willing to consider adopting I.G. as well, if his emotional condition stabilized, and there is no evidence that the prospective adoptive parents would refuse to allow J.F. to visit with I.G. or otherwise foster J.F.'s sibling relationships after the adoption.

In addition, mother has failed to demonstrate how it was an abuse of discretion to determine that any potential disruption of J.F.'s relationship with I.G. constituted a compelling reason not to terminate parental rights. A contention that the sibling relationship is a "compelling reason" for finding detriment to the child calls for the juvenile court to determine the *importance* of the sibling relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.) Mother does not point to any evidence that compels the conclusion that J.F.'s

interests would be better served by remaining a court dependent or that doing so would in any way promote his relationship with I.G., and we find none.  Accordingly, the court did not abuse its discretion in finding that the sibling relationship exception does not apply.

DISPOSITION

The judgment terminating parental rights as to J. F. and R. B. and freeing the minors for adoption is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
        J.

We concur:

RAMIREZ
    P. J.

KING
    J.

11